UNITED STATES, Appellee

v.

**Tomie C. MOSLEY, Airman First Class U.S. Air Force, Appellant.**

No. 94–0245.
CMR No. 30042.

U.S. Court of Appeals for the Armed Forces.

Argued Feb. 15, 1995.

Decided Aug. 25, 1995.

For Appellant: *Lieutenant Colonel Joseph L. Heimann* (argued); *Colonel Jay L. Cohen* and *Captain J. Knight Champion, III* (on brief); *Captain Richard D. Desmond.*

For Appellee: *Captain Timothy G. Buxton* (argued); *Colonel Jeffery T. Infelise* and *Captain Jane M.E. Peterson* (on brief); *Colonel Thomas E. Schlegel.*

*Opinion of the Court*

GIERKE, Judge:

1. Appellant tested positive in a random urinalysis and was charged with wrongfully using cocaine, in violation of Article 112a,

Uniform Code of Military Justice, 10 USC § 912a. On December 9, 1991, the military judge granted a defense motion to retest appellant's urine sample for the presence of ecgoninemethylester (EME), raw cocaine, and benzoylecgonine (BE). The convening authority refused to order the retest, and the military judge abated the proceedings.

2. The Government appealed the military judge's abatement order under Article 62, UCMJ, 10 USC § 862 (1983). On April 28, 1992, the Court of Military Review[1] held that the military judge abused his discretion by ordering the retest and abating the proceedings. 34 MJ 1056, 1061. On April 29, 1992, appellant petitioned this Court to review the decision of the Court of Military Review. 36 MJ 23. On June 2, 1992, we denied appellant's petition without prejudice to appellant's right to raise the issue during the ordinary course of appellate review. 36 MJ 47.

3. On June 12, 1992, appellant's general court-martial continued; and, contrary to his pleas, the military judge, sitting as a general court-martial, convicted him as charged. The approved sentence provides for a bad-conduct discharge, confinement for 30 days, forfeiture of $500.00 pay, and reduction to the lowest enlisted grade. The Court of Military Review affirmed the findings and sentence in an unpublished opinion on September 22, 1993.

4. We granted review on March 25, 1994, of the following issue:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN THEY REVERSED THE DECISION OF THE MILITARY JUDGE, WHO ORDERED A RETEST OF APPELLANT'S URINE SAMPLE FOR BENZOYLECGONINE (BE), ECGONINEMETHYLESTER (EME), AND RAW COCAINE.

5. We hold that the military judge did not abuse his discretion in his ruling and that the court below erred when they reversed that ruling.

[1]. *See* 41 MJ 213, 229 n. 1 (1994).

*Factual Background*

6. Appellant asked the military judge to order a retest of his urine sample after the convening authority had denied the request. Appellate Exhibit II. The Government's Response is App. Ex. III. Appellant asserted two bases for his request: "fairness and to avoid retrying this case at a later date." Appellant argued that his "extremely low level (223 ng/ml)" (nanograms per milliliter) was close enough to the Department of Defense cutoff level of 150 ng/ml to warrant retesting.

7. In support of the request for retesting, defense counsel presented the testimony of Dr. John Vasiliades, former Chief of Quality Assurance at the Air Force Drug Testing Laboratory, who was accepted by both sides as an expert in forensic toxicology. Dr. Vasiliades testified that if a person ingested the normal recreational dose of cocaine, laboratory testing would reveal raw cocaine for about 10 hours, the EME metabolite for 40–48 hours, and the BE metabolite at the DoD (Dept. of Defense) cutoff level for about 72 hours. EME can only be produced by ingesting cocaine in the body; BE can be produced by placing cocaine directly into a urine sample. If a test is positive for BE but negative for EME, there are two possible explanations: (1) the person being tested "ingested cocaine" and "the EME has dissipated"; or (2) someone "put cocaine in the urine" sample "aside from ingestion." The presence of BE and raw cocaine but no EME in the urine sample would indicate that someone "spiked" the urine sample.

8. Dr. Vasiliades testified that testing for EME and raw cocaine could be done "within one day" and "should not cost more than a couple of hundred dollars." In documents attached to the written motion, defense counsel had represented that Northwest Toxicology Laboratory in Salt Lake City, Utah, a DoD certified laboratory, could conduct the EME testing at a cost of $150.00.

9. Finally, Dr. Vasiliades testified that, based on his previous experience at the Air Force Laboratory, appellant's urine sample

should have been frozen and retained, and thus was available for further testing. Dr. Vasiliades was asked if the sample would be "frozen in time" and the breakdown of the sample would be "minimal." He responded in the affirmative, but qualified his answer by testifying that "the only way we would know that is by retest."

10. Trial counsel presented the testimony of Dr. Donald L. Frederick, current Chief of Quality Assurance at the Air Force Drug Testing Laboratory. Dr. Frederick testified, "I don't think it is an absolute" that the presence of raw cocaine but the absence of EME would indicate a "spiked" sample. He explained that "some people that have atypical enzymes in their body and their processing of that compound would not be the same as the majority of us," and therefore EME "may not be present or may be present in such a low level that you wouldn't see it . . . ."

11. Dr. Frederick agreed with Dr. Vasiliades, however, that testing for EME would provide more information and greater certainty "about how much cocaine was ingested or what time frame the cocaine was ingested in[.]" Dr. Frederick testified that the cost for a retest for raw cocaine, BE, and EME would be "probably in the range of $250.00."

12. The military judge granted the defense request for retesting. After trial counsel announced that the convening authority would not order the retest, the military judge abated the proceedings.

13. The military judge's written findings of fact include the following:

(1) Appellant's urine contained a concentration of 223 ng/ml of BE.

(2) Assuming the normal recreational dose of 100 mg of cocaine, "BE will be detectable in the urine up to approximately 72 hours, and EME will be detectable in the urine up to approximately 40–48 hours."

(3) "BE can be produced by ingesting cocaine or by putting cocaine in urine with the right PH balance; EME can be produced only through ingestion."

(4) "By testing for EME and cocaine in conjunction with the BE test, a qualified forensic toxicologist can, with a reasonable degree of certainty, determine whether the cocaine in the urine was ingested by the accused or was placed in the urine from an outside source, either through intentional or unintentional contamination of the sample."

(5) Appellant has no evidence of a break in the chain of custody.

(6) Appellant has no evidence of contamination of his urine sample.

(7) "Testing for BE, EME, and cocaine is a relatively simple procedure" that "will cost the government approximately $250.00."

14. In his conclusions of law, the military judge stated that the results of EME testing would be relevant and that such evidence is "necessary" within the meaning of RCM 703(f)(1), Manual for Courts–Martial, United States, 1984. He concluded by observing, "Indeed, this may be the only way that an accused can effectively challenge the Government's evidence on chain of custody, since an accused is at somewhat of a disadvantage in demonstrating intentional contamination of his sample or unintentional contamination in the testing process."

15. After the Court of Military Review reversed the order of the military judge, the prosecution presented the test results and the stipulated testimony of the persons who obtained appellant's urine sample. The defense case consisted of the stipulated testimony of appellant's superiors and peers, who stated that they were shocked when learning that appellant's urinalysis was positive and they believed that appellant is a truthful person. Then, appellant testified that he did not "knowingly use cocaine" and had no idea how his sample could have tested positive.

### Discussion

16. RCM 703(f)(1), relied upon by the military judge, provides: "Each party is entitled to the production of evidence which is relevant and necessary." The term "necessary" means that the evidence "is not cumulative and . . . would contribute to a party's presentation of the case in some positive way on a matter in issue." RCM 703(f)(1), Discussion.

17. The Court of Military Review held that the military judge's reliance on RCM 703(f)(1) "was erroneous and led to the wrong result." The court stated that RCM 703(f)(1) applies to "a party's right to evidence *already in existence*—not ... evidence ... yet to be created." 34 MJ at 1059. The court below held that appellant's request should have been treated as a request for investigative or expert assistance and that the burden was on appellant to demonstrate the necessity for such assistance. 34 MJ at 1060. *See United States v. Garries*, 22 MJ 288, 290 (CMA), *cert. denied*, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986).

■ 18. The standard for reviewing a military judge's decision to order the production of additional evidence is abuse of discretion. *See United States v. Lampani*, 14 MJ 22, 26 (CMA 1982). We previously have described the standard for reviewing a military judge's exercise of discretion as follows:

> To reverse for "an abuse of discretion involves far more than a difference in ... opinion.... The challenged action must ... be found to be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous' in order to be invalidated on appeal."

*United States v. Travers*, 25 MJ 61, 62 (CMA 1987), *quoting United States v. Yoakum*, 8 MJ 763, 768 (ACMR 1980) (*quoting United States v. Glenn*, 473 F.2d 191, 196 (DC Cir. 1972)), *Yoakum aff'd. on other grounds*, 9 MJ 417 (CMA 1980).

■ 19. In our view, the court below erred by applying the wrong standard. The defense did not assert that they were entitled to a retest under *Garries*, and the military judge did not base his ruling on a showing of necessity under *Garries*. The military judge granted the request on the basis of fundamental fairness, relevance, and the minimal burden on the Government. The question is whether he abused his discretion by granting

the request even if the defense showing of necessity fell short of the *Garries* standard.

■ 20. A military judge enjoys broad discretion on evidentiary and procedural matters. RCM 801 authorizes the military judge to "direct trial counsel to make an inquiry along certain lines to discover and produce additional evidence." RCM 801(c), Discussion. Similarly, Mil.R.Evid. 614(a), Manual, *supra*, allows a military judge to *sua sponte* call witnesses.

■ 21. This case falls into the middle ground where the military judge may not be required, as a matter of law, to grant a defense request, but where he does not exceed the limits of his discretion by doing so. Even assuming that the retest may not have been "necessary" within the meaning of *Garries*, it certainly would have been helpful to the trier of fact. If it showed contamination of the sample, it would have supported the defense. If it failed to show contamination, it would have bolstered the prosecution. The burden imposed on the Government by retesting was minimal, in terms of time and resources.[2]

■ 22. Although the military judge cited RCM 703(f)(1) to support his ruling, his findings of fact and conclusions of law are keyed to the grounds urged by the defense: fundamental fairness, relevance, and the minimal burden on the Government. Once the military judge exercised his discretion, the burden was on the Government to present "conclusive argument that the judge abused his discretion." *United States v. Mukes*, 18 MJ 358, 359 (CMA 1984). We need not decide whether the military judge was required as a matter of law to grant the defense request. We hold only that he did not abuse his discretion by doing so. *Cf. United States v. Robinson*, 39 MJ 88, 89 (CMA 1994) (military judge did not abuse discretion by denying request for additional testing).[3]

---

2. Appellant asserted at trial and continues to assert on appeal, without contradiction from the Government, that he is indigent and cannot afford to pay for a retest. We find it somewhat ironic that the Air Force has spent 3 years litigating its refusal to conduct a simple $250.00 test.

3. We respectfully disagree with Judge Crawford's reliance on RCM 701(b)(2), Manual for Courts–Martial, United States, 1984 (1994 ed.). The rule requires that notice of intent to present an innocent-ingestion defense be given "before the beginning of the trial on the merits." In this case

The decision of the United States Air Force Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered, subject to the military judge's abatement order.

Judges COX and WISS concur.

SULLIVAN, Chief Judge (concurring in the result):

23. The question granted review in this case is:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN THEY REVERSED THE DECISION OF THE MILITARY JUDGE, WHO ORDERED A RETEST OF APPELLANT'S URINE SAMPLE FOR BENZOYLECGONINE (BE), ECGONINEMETHYLESTER (EME), AND RAW COCAINE.

24. A majority of this Court holds that the Air Force Court of Military Review erred in reversing the military judge's order for additional tests on appellant's urine sample. It does so on the basis that evidence which could result from such testing, regardless of whom it favored, would be "additional evidence" to that presented by the parties which a military judge can order to be produced under RCM 801(c), Manual for Courts-Martial, United States, 1984[1]. In sum, the majority, taking the suggestion of Chief Judge Dixon's dissent below, holds that the Court of Military Review erred because it "overlooks the military judge's responsibility in determining what evidence the court should have before it. RCM 801(c)." 34 MJ at 1062. I agree. *See generally* Wright, 2 *Federal Practice and Procedure: Criminal* 2d § 452 at 625 (1982) ("[A]ppointment of an expert by the court ... is quite different from providing experts to assist the defense.")[2]

25. The broad discretionary right of a military judge to call for additional evidence in the interests of justice and the discovery of truth is well established as a matter of military law. *See United States v. Wingart,* 27 MJ 128, 132 (CMA 1988); *United States v. Parker,* 7 USCMA 182, 186, 21 CMR 308, 312 (1956); *United States v. Walters,* 4 USCMA 617, 633, 16 CMR 191, 207 (CMA 1954). It is equally well established in Federal civilian courts (*United States Marshals Service v. Means,* 741 F.2d 1053 (8th Cir.1984); *United States v. Leslie,* 542 F.2d 285, 288–89 (5th Cir.1976); *United States v. Karnes,* 531 F.2d 214, 216–17 (4th Cir.1976); *see* Wright, 2 *Federal Practice and Procedure:* Criminal 2d § 452) and in State courts. *See* 9 Wig-

the trial on the merits had not yet begun when the military judge ordered additional testing.

1. RCM 801 states:

(c) *Obtaining evidence.* The court-martial may act to obtain evidence in addition to that presented by the parties. The right of the members to have additional evidence obtained is subject to an interlocutory ruling by the military judge.

**Discussion**

The members may request and the military judge may require that a witness be recalled, or that a new witness be summoned, or other evidence produced. The members or military judge may direct trial counsel to make an inquiry along certain lines to discover and produce additional evidence. *See also* Mil. R.Evid. 614. In taking such action, the court-martial must not depart from an impartial role.

2. RCM 703 states:

(d) *Employment of expert witnesses.* When the employment at Government expense of an expert is *considered necessary by a party,* the party shall, in advance of employment of the expert, and with notice to the opposing party, submit a request to the convening authority to authorize the employment and to fix the compensation for the expert. The request shall include *a complete statement of reasons why employment of the expert is necessary and the estimated cost of employment.* A request denied by the convening authority may be renewed before the military judge who shall determine whether the testimony of the expert is relevant and necessary, and, if so, whether the Government has provided or will provide an adequate substitute. If the military judge grants a motion for employment of an expert or finds that the Government is required to provide a substitute, the proceedings shall be abated if the Government fails to comply with the ruling. In the absence of advance authorization, an expert witness may not be paid fees other than those to which entitled under subsection (e)(2)(D) of this rule. (Emphasis added.)

more, *Evidence* § 2484 at 276–83 (Chadbourn rev.1981); 1 McCormick on *Evidence* § 8 at 23–28 (4th ed.1992).

26. No standard for determining an abuse of discretion of this power is expressly articulated in RCM 801(c) or by the majority in this case. Previous military case law is silent on this point and instead suggests the virtual unrestricted nature of this right. *See United States v. Wingart,* 27 MJ at 132 (some assistance); *United States v. Parker,* 7 USCMA at 186, 21 CMR at 312 (unrestricted right); *United States v. Walters,* 4 USCMA at 633, 16 CMR at 207 (when unsatisfied). Federal civilian cases are somewhat more demanding, *see United States Marshals Service v. Means,* 741 F.2d at 1059 (compelling circumstances test), but it has not always been so precise. *See United States v. Leslie* and *United States v. Karnes,* both *supra.* ¶ 25. I would hold that a rule of reason be applied which considers the potential significance of the additional evidence against the difficulty, expense, delay, and effect on military operations in obtaining it. *See also* RCM 405(g)(1)(B); *United States v. Benn,* 476 F.2d 1127, 1131 (D.C.Cir.1973), *cited in United States v. Anderson,* 881 F.2d 1128, 1142 (D.C.Cir.1989). *See generally* J. Weinstein & M. Berger, 3 *Weinstein's Evidence* § 614[02] at 614–8 and 614–10.

27. The majority opinion seems to suggest such a standard in terms of its language and result in this case. In any event I would expressly hold that such a standard exists for RCM 801(c) and that it was met in this case. Appellant's record reflects testimony from both defense and government witnesses on the value of the ordered tests, their inexpensive cost and ready availability, a relative low nanogram count on the admitted test results, the suggestion of irregularity in a companion case prosecuted on the basis of tests from the same laboratory and the indigency of the defendant. These are all facts which could be considered by the military judge to support his decision in this case. In my view, the military judge did not abuse his discretion in taking extra steps to ensure justice was done in this case. *Cf. United States v. Robinson,* 39 MJ 88, 89 (CMA 1994) (under circumstances of case military judge not required by Fifth Amendment; Article 46, Uniform Code of Military Justice, 10 USC § 846; and RCM 703(d) to order secretor test). To the extent that the Court of Military Review denied him this power, I find reversible error.

CRAWFORD, Judge (dissenting):

28. I respectfully dissent. I would hold that the military judge abused his discretion in ordering additional testing because appellant had not met his burden to demonstrate the necessity for such expert assistance. While I agree that a judge should be given wide latitude in discretionary decisions, he or she must base decisions in logic as well as in the law.

29. Here, the judge did not require any threshold showing of necessity other than a showing that the retesting was relatively simple and inexpensive. There was no showing that this retesting would support or had any relevance to any specifically asserted defense. For example, as in this case, when an individual tests positive for the use of cocaine, there are numerous strategies that the defense may raise to establish necessity: (a) a break in the chain of custody; (b) mechanical or physical error at the laboratory; (c) misconduct by a scientist at the laboratory; (d) misinterpretation of testing data at the laboratory; (e) contamination of the sample; or (f) innocent ingestion. Here there was no offer of proof as to any of these or any other possible defenses. Additionally, the defense did not give the detailed notice required by RCM 701(b)(2),* Manual for Courts–Martial, United States, 1984 (1994

---

* RCM 701(b)(2) provides:

(2) *Notice of certain defenses.* The defense shall notify the trial counsel before the beginning of trial on the merits of its intent to offer the defense of ... innocent ingestion.... Such notice by the defense shall disclose ... in the case of an innocent ingestion defense, the place or places where, and the circumstances under which the defense claims the accused innocently ingested the substance in question, and the names and addresses of the witnesses upon whom the accused intends to rely to establish any such defenses.

ed.), concerning the defense of innocent ingestion.

30. Thus, I would conclude that the judge abused his discretion in not requiring the defense to carry its burden of coming forward with any strategy to establish the necessity for additional testing.

## FACTS

31. Appellant was randomly selected to provide urine samples for drug testing. Analysis of appellant's sample revealed a benzoylecgonine (BE) concentration of 223 ng/ml. At the time, the Department of Defense BE cutoff level for reporting samples as positive was 150 ng/ml. Shortly after charges were preferred, appellant requested that his sample be tested again for the presence of BE and for the cocaine metabolite ecgoninemethylester (EME). The convening authority denied his request.

32. At a session under Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), defense counsel again sought additional tests of the accused's sample for BE and EME, and added a request that the samples be tested for the presence of raw cocaine. After hearing the testimony of a defense expert and a government expert, the judge granted the defense motion and ordered all the requested tests. When notified of the convening authority's refusal to follow his order, the judge abated the proceedings.

33. The Government appealed from the military judge's order for further tests of the urine sample. The Court of Military Review held that the military judge abused his discretion when he ordered the requested tests based upon the determination that they were necessary under the rule governing the accused's right to evidence. 34 MJ 1056 (1992). We denied review of this decision. After appellant's trial results were affirmed by that court, we granted appellant's petition for review.

## DISCUSSION

34. Our cases have reviewed scientific evidence demonstrating that urinalysis testing can show the presence of various material in the urine: raw cocaine, EME, and BE. *Cf. United States v. Kelly*, 39 MJ 235 (CMA 1994); *United States v. Robinson*, 39 MJ 88 (CMA 1994); *United States v. Mack*, 33 MJ 251 (CMA 1991). Studies, as noted by these cases, have shown that raw cocaine dissipates quite quickly in a urine sample and thus often does not show up in a test unless the user has ingested the cocaine very recently. EME, however, will remain present in the urine for a longer period of time. EME also is only present in someone's urine sample if that person actually ingested cocaine because EME is a natural metabolite that the body produces in reaction to cocaine. Finally, BE has an even longer presence in urine than either raw cocaine or EME. If a person ingested cocaine a few days prior to a urinalysis test, it is possible that both raw cocaine and EME will have dissipated and that the testing results would show only a presence of BE. The interesting aspect about BE is that it is not a natural reaction to cocaine from the body, that is, it can show up in urine either from ingestion or from a spiked urine sample, *i.e.,* if someone contaminated the urine sample by putting cocaine directly into the urine prior to testing.

35. Given these scientific facts, we are faced here with the question of whether an accused is entitled to further urinalysis testing if the original testing only produces a positive result for BE. Furthermore, we must decide this question where the accused has not shown a scintilla of evidence of the following: a problem with the chain of custody; an opportunity to spike the urine sample (contamination); or notice of an innocent-ingestion theory required by RCM 701(b)(2). Absent such an offer of proof, I believe the military judge abused his discretion when he granted the defense motion for further testing.

36. The accused's request should have been analyzed by the judge in terms of the cases discussing the need for expert assistance. This is exactly how this issue has been treated in the past.

37. Like the Supreme Court, *see Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Ake v. Oklahoma*, 470

U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), we have recognized that appellant has the burden to establish the necessity for expert assistance. *See United States v. Kelly* and *United States v. Robinson*, both *supra*. ¶ 34.

38. In *Robinson* this Court stated:

The Equal Protection Clause, the Due Process Clause, the Code, and the Manual provide that servicemembers are entitled to expert assistance when necessary for an adequate defense....

39 MJ at 89 (footnote and citations omitted). We stated in *United States v. Garries*, 22 MJ 288, 291 (CMA 1986): "When an accused applies for the employment of an expert, he must demonstrate the necessity for the services."

39. As the Court of Appeals for the Eleventh Circuit explained in *Moore v. Kemp*:

*Ake* and *Caldwell [v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)], taken together, hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand....

809 F.2d 702, 712 (footnote omitted), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).

40. In this case the minimal threshold showing is lacking. Indeed, the judge acknowledges this vacuum in his findings of fact where he concluded that the accused failed to show any evidence of a break in the chain of custody, evidence of contamination of the urine sample, or innocent ingestion. Appellant is not entitled to an expert when he or she offers little more than "undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. at 324 n. 1, 105 S.Ct. at 2637 n. 1.

41. As to the chain of custody, the defense did not present any evidence of precautions that were not taken to prevent substitution, *e.g.*, leaving the sample unattended, failing to have appellant observe the sealing of the sample, establishing that multiple samples were taken on the day of appellant's sample, and so forth.

42. In *United States v. Robinson*, 39 MJ at 89, this Court held that there is no abuse of discretion in failing to order a secretor test which could "detect a mismatch" of blood types when there are " 'no apparent' discrepancies 'in the collection, handling, or testing' of appellant's 'urine sample.' " As the Government orally argued, the reason for the request for the various tests in this case is because many individuals read *United States v. Mack*, 33 MJ 251 (CMA 1991), as standing for the proposition that test results are inadequate to show the wrongful use of cocaine where the Government test for BE was positive and the Government test for EME was negative.

43. Without a threshold showing of a problem in the chain of custody, adulteration, contamination, or innocent ingestion, the defense has not met its burden for demonstrating the necessity for additional testing. Judge Cox underscored the importance of a focus on the chain of custody in his dissent in *Mack*, by stating:

The absence of EME is not the decisive factor if BE is present in the sample and the chain of custody is established.... [M]y concern is the integrity of the chain of custody and not the lack of EME in the sample. If the sample was unadulterated, the absence of EME means only that the cocaine had dissipated from the system before the time of the test.

33 MJ at 256.

44. As this Court has repeatedly held, the accused must demonstrate a reasonable probability that the expert assistance would be critical to his or her defense and that the failure to secure the expert assistance would result in a fundamentally unfair trial. *See Rock v. Arkansas* and *Ake v. Oklahoma*, both *supra*. ¶ 37. That simply is not present here.

45. Thus, I would conclude that the military judge abused his discretion by ordering additional testing where the accused has not met his burden of demonstrating the necessity for the testing. Accordingly, I would affirm the decision of the court below.